## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **Criminal Number:** |
| | : | |
| v. | : | **VIOLATION:** |
| | : | **18 U.S.C. § 371** |
| DENNIS N. ABBOTT, | : | |
| | : | |
| Defendant. | : | |

## I N F O R M A T I O N

The United States charges:

### COUNT ONE

### 18 U.S.C. § 371 – Conspiracy

Unless specified otherwise, at all relevant times:

### INTRODUCTION

1.      From on or about February 5, 2004, through on or about July 28, 2004, defendant

DENNIS N. ABBOTT (ABBOTT) and other employees of a British Petroleum subsidiary, BP

Products North America (BP), conspired to manipulate and corner the February 2004 market for

TET propane.  ABBOTT and his conspirators used BP's financial resources to buy substantially

all of the February 2004 TET propane supply to become the dominant owner, or "long-holder,"

of TET propane.  The conspirators intended to reduce the available supply of February 2004 TET

propane so they could sell that propane at a fraudulently inflated price and provide BP with an

excessive profit.  As a result of the conspirators' conduct, BP acquired and controlled

approximately 90% of February 2004 TET propane supplies in the United States.  ABBOTT and

his conspirators thereafter sold propane at artificial prices fraudulently inflated through

manipulation of the market.

## BACKGROUND

BP's Trading in TET Propane

2.        BP, a wholly-owned subsidiary of British Petroleum, plc, is headquartered in

Warrenville, Illinois.  BP trades numerous energy commodities, including propane.

3.        Propane is a natural gas liquid ("NGL").  Propane is used for chemical processes

and as a source of energy for residential and commercial purposes.  Residential and commercial

demand for propane is a significant component of the overall demand for propane in the United

States.  Because residential and commercial demand for propane is primarily for heating homes

and businesses, demand for propane is seasonal.

4.        Residential and commercial consumption of propane is greatest in the Northeast

and Midwest sections of the United States.  The primary means by which propane is delivered to

these regions is the TEPPCO pipeline system, which is the only pipeline transporting propane

from Mont Belvieu, Texas, to the Northeast and Midwest.  Propane in the TEPPCO pipeline is

identified as TET propane.

5.        TET Propane is a commodity as defined in Title 7, United States Code, Section

1(a)(4), and TET propane that flows through the TEPPCO pipeline crosses various states.  As a

result, TET propane is a commodity in interstate commerce.

6.        Propane prices are published by the Oil Price Information Service ("OPIS").  The

2

prices published by OPIS are specific to the type of propane, such as TET propane, and the month or time period for which the propane is delivered. Generally, a price is published for the current month, the next month and for delivery the next day. Propane traders trade TET propane contracts based upon these delivery distinctions.

7.     The OPIS prices quoted for TET propane affect the price paid by both commodities traders and end users, such as commercial and residential consumers of propane in the Midwest and Northeast, including Illinois, Indiana, New York, Ohio, and Pennsylvania.

The BP Trading Bench

8.     The group within BP that trades propane in the United States is the Natural Gas Liquids Trading Unit ("NGL Trading Bench"). The NGL Trading Bench trades propane for use in BP's wholesale and petrochemical businesses, and for speculative purposes to generate a profit.

9.     During February 2004, the NGL Trading Bench employed approximately nine traders. These traders executed commodities trades and assisted with the development and execution of trading strategies. During the conspiracy, trading for TET propane was primarily executed by one BP trader ("BP Trader #1").

10.     The direct supervisor of the BP traders was the bench team leader known as the "bench leader" ("BP's Bench Leader"). In turn, BP's Bench Leader reported to several BP executives. These BP executives included a Vice President responsible for supervising BP's trading in NGL ("BP Employee #3"), and a senior executive responsible for BP's NGL operations ("BP Employee #4"). The trading bench and these executives consulted a BP

3

Compliance Manager ("BP Employee #5"), regarding the trading strategies of BP's trading bench. BP's Bench Leader's responsibilities included the development and oversight of BP's trading strategies, and reporting to and seeking approval from BP's senior executives who oversaw trading operations.

11.     From approximately 2000 to October 2005, ABBOTT was an employee of BP and a member of the NGL Trading Bench. During 2004, ABBOTT traded primarily butane, and as the need arose, propane and other commodities.

## THE CONSPIRACY

12.     From on or about February 5, 2004, to on or about July 28, 2004, within the District of Columbia, the Northern District of Illinois, the Southern District of Texas, and elsewhere, the defendant

### DENNIS N. ABBOTT,

did knowingly and willfully conspire and agree with BP Trader #1, BP's Bench Leader, BP Employees #3, #4, and #5, and others, to manipulate and attempt to manipulate the price of February 2004 TET propane, and to corner and to attempt to corner the market of February 2004 TET propane, a commodity in interstate commerce, contrary to Title 7, United States Code, Section 13(a)(2).

## PURPOSE OF THE CONSPIRACY

13.     Purposes of the conspiracy included: (a) enriching BP by inflating the price of February 2004 TET propane by unlawful means and then selling the propane at the inflated price, and (b) enriching the conspirators by obtaining bonuses and other remuneration from BP.

## MANNER AND MEANS

14.     The conspiracy was carried out through the following manner and means, among others:

a.     In order to determine when market conditions would be ripe to corner the TET propane market, ABBOTT and his conspirators would gather information about available supply, by, among other things, attempting to manipulate the TET propane market in April and May of 2003, and by accessing TEPPCO propane inventory levels on the internet in February 2004.

b.     When it was determined that the market was ripe for manipulation, ABBOTT and his conspirators would execute their strategy of acquiring the entire available supply of February 2004 TET propane using the financial resources of BP, to force other market participants holding short positions in TET propane at the end of February to purchase TET propane from BP at artificial prices.

c.     ABBOTT and his conspirators would conceal from the market their intention to corner the supply of February 2004 TET propane, by presenting "false" or "show" offers – offers that were designed to make it appear that BP wished to sell propane, but instead were sufficiently above the prevailing asking price that they would not result in a sale – deceiving the market participants as to the true availability of TET propane.

d.     When BP would achieve ownership of almost the entire supply of February 2004 TET propane, ABBOTT and his conspirators would sell the propane at artificial prices fraudulently inflated by the conspirators' conduct, to other market participants holding

5

short positions.

        e.      ABBOTT and his conspirators would personally profit by obtaining bonuses and other remuneration as a result of the profits BP achieved through the market manipulation.

## OVERT ACTS

       15.    In furtherance of the conspiracy and to achieve its purposes, defendant ABBOTT and others:

### Formulating the February 2004 Market Manipulation

        a.      On or about February 5, 2004, ABBOTT and BP's Bench Leader agreed in a telephone conversation that the February 2004 strategy to corner the TET propane market would establish that they and BP could *"control the market at will"* and thereby profit from future market manipulations.

### Obtaining Approval of Senior BP Management for the Market Manipulation

        b.      On or about February 5, 2004, BP's Bench Leader discussed with BP Employees #3 and #5 the strategy to control the February 2004 TET propane market through manipulation.

        c.      By February 19, 2004, BP Employee #4, following his discussion of the market manipulation strategy with BP's Bench Leader, authorized the conspirators to use BP funds to reach a dominant long position concerning February 2004 TET propane.

### Using BP's Financial Resources to Become the "Dominant Long" Holder

        d.      ABBOTT and his conspirators, in accordance with their market

6

manipulation strategy to become the dominant-long holder of February 2004 TET propane, engaged in the following specific trades, among others:

> 1)     On February 9, 2004, ABBOTT purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.615 cents per gallon;

> 2)     On February 9, 2004, ABBOTT purchased 50,000 barrels of February 2004 TET propane on behalf of BP at 0.605 cents per gallon;

> 3)     On February 9, 2004, BP Trader #1 purchased 150,000 barrels of February 2004 TET propane on behalf of BP at 0.61 cents per gallon; and

> 4)     On February 11, 2004, ABBOTT purchased 100,000 barrels of February 2004 TET propane on behalf of BP at 0.64 cents per gallon.

<u>Concealing the Market Manipulation</u>

 e.     On or about February 9, 2004, to prevent the market and others from learning the true nature of their strategy, BP Employee #5 instructed BP's Bench Leader that the NGL Trading Bench must refrain from using words, such as "squeeze," "leverage," and "corner," in telephone conversations or corporate emails.

 f.     On or about February 19, 2004, in order to further deceive the market, BP Trader #1 responded to an inquiry by a market participant whether he and BP were trying to "corner" the TET market, by falsely stating that this market participant was "badly mistaken."

<u>Obtaining Further Approvals from BP's Senior Management</u>

 g.     On or about February 19, 2004, due to the large position of TET propane held by BP at that point, the possibility of BP losing money, and the reputational risk to BP,

ABBOTT, BP's Bench Leader and BP Trader #1, agreed to seek continued management approval of their strategy.

      h.     Between February 19 and February 24, 2004, BP's Bench Leader discussed the status of the market corner strategy and the size of BP's February 2004 TET propane position with BP Employee #3, who approved the continued execution of the strategy despite the consequential reputational risk to BP.

      i.     Between February 19 and February 24, 2004, BP's Bench Leader discussed the status of the market corner strategy and the size of BP's February 2004 TET propane position with BP Employee #4, who approved the continued execution of the strategy despite the consequential reputational risk to BP.

      j.     Between February 19 and February 24, 2004, BP's Bench Leader discussed the status of the market corner strategy and the size of BP's February 2004 TET propane position with BP Employee #5, who approved the continued execution of the strategy despite the consequential reputational risk to BP.

      k.     On or about February 24, 2004, BP's Bench Leader directed ABBOTT and BP Trader #1 to "defend the position" and continue to purchase February 2004 TET propane to achieve and maintain market dominance.

      l.     On February 24, 2004, BP Trader #1 purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.7825 cents per gallon.

      m.     On February 24, 2004, ABBOTT purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.75 cents per gallon.

Selling February TET Propane at Artificial Prices

        n.     ABBOTT and his conspirators, in order to profit from the scheme, engaged in the following sales of propane, among others, at artificial prices:

        1)     On February 27, 2004, BP Trader #1 sold to Company A 40,000 barrels of February 2004 TET propane on behalf of BP at 0.94 cents per gallon;

        2)     On February 27, 2004, BP Trader #1 sold to Company B 10,000 barrels of February 2004 TET propane on behalf of BP at 0.94 cents per gallon;

        3)     On February 27, 2004 BP Trader #1 sold to Company C 25,000 barrels of February 2004 TET propane on behalf of BP at 0.93 cents per gallon; and

        4)     On February 27, 2004 ABBOTT sold to Company D 5,000 barrels of February 2004 TET propane on behalf of BP at 0.925 cents per gallon.

9

All in violation of Title 18, United States Code, Section 371.

DATE:  JUNE 28, 2006

PAUL E. PELLETIER
Acting Chief, Fraud Section
Criminal Division


JERROB DUFFY
Trial Attorney, Fraud Section
Criminal Division


STACEY R. LUCK
Trial Attorney, Fraud Section
Criminal Division


U.S. Department of Justice
950 Pennsylvania Avenue
Washington, D.C.  20530
Phone: (202) 514-4018
Facsimile: (202) 514-0152