UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

J.N

OCT 2 5 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Number: |
| | ) | |
| v. | ) | **VIOLATION:** |
| | ) | 18 U.S.C. § 371 |
| MARK DAVID RADLEY, | ) | 18 U.S.C. § 1341 |
| JAMES WARREN SUMMERS, | ) | 18 U.S.C. § 1343 |
| CODY DEAN CLABORN | ) | 7 U.S.C. § 13(a)(2) |
| and | ) | |
| CARRIE KIENENBERGER, | ) | |
| | ) | |
| Defendants. | ) | |

JUDGE SHADUR

07CR    689

MAGISTRATE JUDGE DENLOW

**INDICTMENT**

The Grand Jury charges:

**COUNT ONE**

**18 U.S.C. § 371 – Conspiracy**

Unless specified otherwise, at all relevant times:

I.    **Introduction**

1.    From on or about February 5, 2004 through at least March 15, 2004, defendants

**MARK DAVID RADLEY, JAMES WARREN SUMMERS, CODY DEAN CLABORN**, and

**CARRIE KIENENBERGER** (collectively "defendants"), and other employees of subsidiaries

of BP America Inc. (collectively "BP"), conspired to corner the market and manipulate the price

of propane transported in the TEPPCO pipeline system (hereafter "TET" propane).

2.    As part of the conspiracy, defendants used the financial resources of BP to buy

contracts for delivery of TET propane at the end of February 2004 ("February 2004 TET

propane") to make BP the dominant owner of February 2004 TET propane. Defendants

exploited their dominant market power by continuing to purchase large quantities of February

2004 TET propane throughout the month, withheld February 2004 TET propane from the market,

and used specific bidding tactics all to artificially inflate the price of February 2004 TET

propane. Defendants, and others, thus cornered the market for February 2004 TET propane and

sold it at prices that were artificially inflated.

3.      Furthermore, the defendants, through their conduct, inflated the industry

benchmark index price of February 2004 TET propane. Defendants sold February 2004 TET

propane to counterparties based on the inflated index price, and defrauded counterparties who

purchased from BP at the inflated index price.

## II.      **Background**

### A.      BP and the NGL Trading Bench

4.      BP America Inc. and BP Products North America Inc. ("BP Products") were

based in Warrenville, Illinois. Defendants were employees of BP America Production Company,

an indirect subsidiary of BP America Inc., and were assigned to the Integrated Supply & Trading

("IST") group, which was BP's worldwide trading business. Within IST, the trading of natural

gas liquids in the United States, including propane, was conducted by the Natural Gas Liquids

("NGL") trading bench ("NGL Trading Bench").

5.      The NGL Trading Bench was located in Houston, Texas. It traded TET propane

with counterparties located throughout the United States. After a trade was executed, a

confirmation notice was sent to the counterparty, via the mails and interstate wire

communications, between BP's offices in Texas or Illinois and the various counterparties' offices

in Texas, Illinois, New York and elsewhere. Funds from the conspirators' sales of TET propane were transmitted by counterparties via the mails and interstate wires to BP Products' bank account in Chicago.

6. Defendants commonly were granted a year-end bonus, which was based in part on trading profits of the NGL Trading Bench.

B. Defendants and their Conspirators

7. Defendant **MARK DAVID RADLEY** ("**RADLEY**") was the bench leader of the NGL Trading Bench. **RADLEY**'s responsibilities included the development and oversight of trading strategies.

8. Defendant **JAMES WARREN SUMMERS** ("**SUMMERS**") was a Vice President of NGLs and **RADLEY's** supervisor. Defendant **SUMMERS** was also responsible for supervising the activities of the NGL Trading Bench and approving trading strategies.

9. Defendant **CODY DEAN CLABORN** ("**CLABORN**") was the primary trader on the NGL Trading Bench responsible for trading TET propane during years 2003 and 2004, among other times.

10. Defendant **CARRIE KIENENBERGER** ("**KIENENBERGER**") was a trader on the NGL Trading Bench who traded TET propane during February 2004.

11. Dennis N. Abbott ("ABBOTT") was a trader on the NGL Trading Bench during years 2003 and 2004, among other times.

12. BP Trader #4 was a trader on the NGL Trading Bench primarily responsible for trading other categories of propane during years 2003 and 2004, among other times. BP Trader #4 traded TET propane during February 2004.

3

C.    TET Propane Market

13.    Propane, a natural gas liquid, was used by petrochemical industries to produce plastics and was also used as a source of energy for residential and commercial purposes. Residential and commercial consumption of propane was greatest in the Northeast and Midwest sections of the United States, including Chicago, Illinois. The primary means by which TET propane was delivered to these regions from the Gulf Coast was the Texas Eastern Products Pipeline Company, LLC ("TEPPCO") interstate pipeline system. TET propane was a commodity as defined in Title 7, United States Code, Section 1a(4) and TET propane was a commodity in interstate commerce.

14.    TET propane predominantly was traded over-the-counter in one of three ways: (a) directly between two parties; (b) through voice brokers; and (c) through an electronic trading platform known as "Chalkboard." In voice broker transactions, brokers negotiated and executed deals on behalf of a buyer and seller. In Chalkboard transactions, buyers and sellers posted anonymous bids and offers on the Chalkboard electronic website, and would learn the counterparty's identity only upon completing a transaction. Propane sales were generally traded in lots of 1,000 barrels and each barrel was the equivalent of 42 gallons of propane.

15.    Propane prices were published by the Oil Price Information Service ("OPIS") and were specific to the type of propane, such as TET propane. OPIS published daily and monthly average prices based on information collected daily from market participants. The OPIS daily average consisted of the unweighted mean between the lowest and the highest reported transaction prices on a given day.

16.    Defendants and other propane traders sometimes traded contracts at an OPIS

4

index daily or monthly price. OPIS prices published for TET propane would affect the price paid by commodity traders and end users of propane in the Midwest and Northeast.

17.    Companies A through P, among others, purchased February 2004 TET propane from BP.

### III.    The Conspiracy

18.    Beginning on or about February 5, 2004, and continuing through at least March 15, 2004, in the Northern District of Illinois, and elsewhere, defendants

**MARK DAVID RADLEY,
JAMES WARREN SUMMERS,
CODY DEAN CLABORN
and
CARRIE KIENENBERGER,**

did knowingly and willfully conspire, confederate and agree with each other and others to commit the following offenses against the United States:

a.    to manipulate and attempt to manipulate the price of February 2004 TET propane, and to corner and to attempt to corner the market of February 2004 TET propane, a commodity in interstate commerce, contrary to Title 7, United States Code, Section 13(a)(2); and

b.    to devise a scheme and artifice to defraud OPIS index price purchasers of February 2004 TET propane, and to obtain money and property by means of materially false pretenses, representations, and promises, and to utilize the United States mails, private and commercial interstate carriers, and interstate wire communications for the purpose of executing that scheme and artifice, contrary to Title 18, United States Code, Sections 1341 and 1343.

### A.    Purposes of the Conspiracy

The principal purposes of the conspiracy included:

19.     to artificially inflate the price of February 2004 TET propane and thereby enrich BP by selling propane at the inflated spot price;

20.     to artificially inflate the price of February 2004 TET propane and thereby enrich BP by selling propane at an inflated OPIS index price; and

21.     to enrich the conspirators by obtaining from BP bonuses and other remuneration based in part upon BP's profits from sales of February 2004 TET propane at artificially inflated prices.

**B.     Manner and Means**

The conspiracy was carried out through the following manner and means, among others:

22.     To determine when the TET propane market conditions were ripe for manipulation and to corner, the conspirators would gather information by, among other things, attempting a similar scheme in 2003 and by accessing TEPPCO propane inventory levels on the internet in February 2004.

23.     When the conspirators would determine the market was ripe for manipulation and to corner, they would buy February 2004 TET propane using the financial resources of BP in an attempt to own a dominant position, to force month-end purchasers of TET propane to purchase from BP at artificial prices.

24.     The conspirators would then present "false" or "show" offers – offers that were designed to make it appear that BP wished to sell propane, but instead were sufficiently above the prevailing asking price that they would not result in a sale – in order to mislead the market about the true supply of February 2004 TET propane.

25.     The conspirators would cause the price of propane to increase and prevent other

6

participants from executing a transaction at a price below the "floor" as set by the conspirators: by using specific bidding tactics from on or about February 23 through on or about February 27, 2004; by selectively withholding February 2004 TET propane from the market; and by continuing to accumulate February 2004 TET propane.

26.     When BP achieved ownership of almost the entire supply of February 2004 TET propane, the conspirators would sell the propane to other market participants at spot prices artificially inflated by the conspirators' conduct.

27.     The conspirators would sell February 2004 TET propane to counterparties based on the reported OPIS index price that was artificially inflated by the conspirators' manipulative conduct.

28.     The conspirators would personally profit by obtaining bonuses and other remuneration as a result of the profits BP would presumably achieve through the success of the scheme.

### C. Overt Acts

In furtherance of the conspiracy and to achieve its purposes, the conspirators and others committed the following overt acts within the Northern District of Illinois, and elsewhere:

Formulating the February 2004 Market Manipulation

29.     On or about February 5, 2004, **RADLEY** and ABBOTT discussed by telephone how the successful execution of the scheme to manipulate the February 2004 TET propane market would establish that they and BP could *"control the market at will"* and how to seek approval for the scheme from **SUMMERS**.

30.     Between on or about February 5, 2004 and February 9, 2004, **RADLEY** obtained

approval from **SUMMERS** for the conspirators to use BP funds to execute the scheme.

31.    On or about February 9, 2004, in a telephone conversation, **RADLEY**,

**CLABORN** and ABBOTT discussed the implementation of the scheme with respect to BP's

sales based on the OPIS index price, and **RADLEY** concluded: "*If we squeeze it in the last four*

*or five days of the month . . . it's going to be hard to say what's the fair price of the market at the*

*time.*"

<u>Using BP's Financial Resources to Become the "Dominant Long" Holder</u>

32.    The conspirators, in accordance with their scheme to manipulate the price and to

corner the market of February 2004 TET propane, accumulated contracts for delivery in excess of

the entire inventory of TET propane at the TEPPCO facility by at least February 19, 2004,

through the following specific trades, among others, each of which is a separate overt act:

a.    On or about February 9, 2004, ABBOTT purchased 25,000 barrels of

February 2004 TET propane on behalf of BP at 0.615 cents per gallon;

b.    On or about February 9, 2004, ABBOTT purchased 50,000 barrels of

February 2004 TET propane on behalf of BP at 0.605 cents per gallon;

c.    On or about February 9, 2004, **CLABORN** purchased 150,000 barrels of

February 2004 TET propane on behalf of BP at 0.61 cents per gallon; and

d.    On or about February 11, 2004, ABBOTT purchased 100,000 barrels of

February 2004 TET propane on behalf of BP at 0.64 cents per gallon.

<u>Concealing the Market Manipulation</u>

33.    On or about February 13, 2004, the conspirators discussed their concern that

others in the market would learn about the scheme, and agreed to refrain from using words, such

8

as "squeeze," "leverage," and "corner," in meetings, telephone conversations or corporate emails.

34.     On or about February 13, 2004, **SUMMERS**, **CLABORN**, ABBOTT and BP

Trader #4 discussed the scheme and allegations of wrongdoing that had been made by other

traders, and agreed that they would conceal the true nature of the scheme from other market

participants.

35.     On or about February 19, 2004, when another market participant asked whether

BP was trying to corner the TET propane market, **CLABORN** falsely replied that the market

participant was "badly mistaken."

Continued Accumulation of TET Propane

36.     The conspirators engaged in the following additional purchases of February 2004

TET propane during the last week of February to attempt to increase the price, despite the fact

that BP had no commercial need for the propane, knowing that BP would carry the propane into

March at a loss, each of which is a separate overt act:

a.     On or about February 24, 2004, **CLABORN** purchased 25,000 barrels of

February 2004 TET propane on behalf of BP at 0.7825 cents per gallon;

b.     On or about February 24, 2004, ABBOTT purchased 25,000 barrels of

February 2004 TET propane on behalf of BP at 0.75 cents per gallon;

c.     On or about February 25, 2004, **KIENENBERGER** purchased 100,000

barrels of February 2004 TET propane on behalf of BP at 0.86 cents per gallon;

d.     On or about February 25, 2004, **KIENENBERGER** purchased 50,000

barrels of February 2004 TET propane on behalf of BP at 0.855 cents per gallon;

e.     On or about February 25, 2004, BP Trader #4 purchased 20,000 barrels of

February 2004 TET propane on behalf of BP at 0.90 cents per gallon;

        f.     On or about February 26, 2004, ABBOTT purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.83 cents per gallon;

        g.     On or about February 26, 2004, **CLABORN** purchased 25,000 barrels of February 2004 TET propane on behalf of BP at 0.84 cents per gallon; and

        h.     On or about February 27, 2004, **CLABORN** purchased 2,500 barrels of February 2004 TET propane on behalf of BP at 0.86 cents per gallon.

<u>Continued Execution of Scheme Despite Potential Discovery</u>

    37.    On or about February 23, 2004, the conspirators discussed additional market "rumors" relating to BP trying to manipulate or squeeze the TET propane market, and the potential "reputational risk" that could befall BP and the conspirators as a result of the continuing scheme.

    38.    On or about February 23, 2004, **SUMMERS** directed the conspirators to "go make money" on the manipulation strategy, concluding that the reputational risk was a "sunk cost" and to do otherwise would have resulted in a loss to BP.

<u>Selective Withholding of Contracts/Supply</u>

    39.    On or about February 23, 2004, **RADLEY** directed the conspirators not to sell propane until they saw "the big shorts come in."

    40.    On or about February 26, 2004, **RADLEY** directed the conspirators to refrain from selling propane to other market participants.

    41.    At certain times during late February, as set forth below, the conspirators refused to sell physical February 2004 TET propane to counterparties as part of their strategy to drive up

the price, each of which is a separate overt act:

      a.     On or about February 20, 2004, ABBOTT refused to sell February 2004 TET propane to a counterparty because the conspirators wanted to withhold supply to artificially inflate the price;

      b.     On or about February 23, 2004, though BP's position exceeded approximately 4 million barrels of February 2004 TET propane, **CLABORN** refused to sell February 2004 TET propane to a counterparty; and

      c.     On or about February 26, 2004, **KIENENBERGER** withheld February 2004 TET propane from a counterparty, though that counterparty offered to pay "best bid," or the highest price in the market place at that time.

<u>Bidding during February 23-27 To Inflate Index Price and Manipulate Spot Price</u>

    42.  As set forth below, the conspirators placed bids to "buy" propane on Chalkboard during the early mornings of on or about February 23 through on or about February 27, 2004, each of which was the "best bid" in the market at the time it was placed, and each of which was placed with the intent to: (1) push up or "step up" the February 2004 TET propane spot price; (2) force market participants to pay BP a price higher than where BP artificially set the bid; (3) deceive market participants about the demand for propane; and (4) permit BP to profit by selling propane based on the "OPIS average" price for that day, which average the conspirators sought to increase by placing such bids, each of which is a separate overt act:

| Para. No. | Conspirator | Date | Time | BP Bid Price/gal |
|---|---|---|---|---|
| a. | ABBOTT | 2/23/04 | 7:32:19 | 0.60 |
| b. | BP Trader #4 | 2/23/04 | 7:33:03 | 0.62 |

| c. | ABBOTT | 2/23/04 | 7:34:35 | 0.655 |
|----|--------|---------|---------|-------|
| d. | BP Trader #4 | 2/23/04 | 7:35:11 a.m. | 0.665 |
| e. | **CLABORN** | 2/23/04 | 7:44:37 a.m. | 0.675 |
| f. | **CLABORN** | 2/23/04 | 8:05:35 a.m. | 0.67625 |
| g. | **CLABORN** | 2/23/04 | 8:05:41 a.m. | 0.6775 |
| h. | **CLABORN** | 2/23/04 | 8:05:42 a.m. | 0.67875 |
| i. | **CLABORN** | 2/23/04 | 8:05:43 a.m. | 0.68 |
| j. | **CLABORN** | 2/23/04 | 8:05:44 a.m. | 0.68125 |
| k. | ABBOTT | 2/24/04 | 7:57:36 a.m. | 0.72 |
| l. | ABBOTT | 2/24/04 | 7:57:41 a.m. | 0.7225 |
| m. | ABBOTT | 2/24/04 | 7:57:45 a.m. | 0.725 |
| n. | ABBOTT | 2/24/04 | 7:57:50 a.m. | 0.7275 |
| o. | ABBOTT | 2/24/04 | 7:58:16 a.m. | 0.73 |
| p. | **CLABORN** | 2/24/04 | 8:21:35 a.m. | 0.7225 |
| q. | **CLABORN** | 2/24/04 | 8:32:13 a.m. | 0.72375 |
| r. | **CLABORN** | 2/24/04 | 8:32:15 a.m. | 0.725 |
| s. | **CLABORN** | 2/24/04 | 8:32:18 a.m. | 0.72625 |
| t. | **CLABORN** | 2/24/04 | 8:32:23 a.m. | 0.7275 |
| u. | **CLABORN** | 2/25/04 | 6:58:01 a.m. | 0.86 |
| v. | **CLABORN** | 2/26/04 | 6:59:10 a.m. | 0.85 |
| w. | **CLABORN** | 2/26/04 | 7:10:05 a.m. | 0.82125 |
| x. | **KIENENBERGER** | 2/27/04 | 7:14:29 a.m. | 0.77625 |

43.    On or about February 25, 2004, **CLABORN** purchased February 2004 TET

propane from a counterparty and declined a discount offered to him unless the counterparty

agreed not to report the price of the transaction to OPIS, because the discounted price would have

constituted the OPIS low price for the day.

<u>Selling February TET Propane at Artificial Spot Prices</u>

44.     The conspirators named below engaged in the following sales of TET propane at artificial spot prices in order to profit from the scheme, and thereby caused BP to receive funds in connection with each transaction via wire transfer to BP's account at Bank One, in Chicago, Illinois, each of which is a separate overt act:

a.      On or about February 27, 2004, **CLABORN** sold to Company A 40,000 barrels of February 2004 TET propane on behalf of BP at an artificially inflated price of 0.94 cents per gallon;

b.      On or about February 27, 2004, **CLABORN** sold to Company B 10,000 barrels of February 2004 TET propane on behalf of BP at an artificially inflated price of 0.94 cents per gallon;

c.      On or about February 27, 2004 **CLABORN** sold to Company C 25,000 barrels of February 2004 TET propane on behalf of BP at an artificially inflated price of 0.93 cents per gallon; and

d.      On or about February 27, 2004 ABBOTT sold to Company D, located in the Northern District of Illinois, 5,000 barrels of February 2004 TET propane on behalf of BP at an artificially inflated price of 0.925 cents per gallon.

45.     On or about February 27, 2004, **KIENENBERGER** offered to sell 10,000 barrels of February 2004 TET propane on behalf of BP on Chalkboard at 0.94 cents per gallon.

46.     On or about March 10, 2004, **CLABORN** forced a counterparty that had been "caught short" in its position of 25,000 barrels from February to financially settle by paying 0.94 cents per gallon, the February 27 OPIS high spot price, which had been made artificial and

13

inflated by the conspirators.

Causing Funds to be Sent by U.S. Mail

47.    In connection with a sale of February 2004 TET propane that occurred on or about February 27, 2004 at an artificially inflated price, **CLABORN** caused Company B to issue check No. 2266 payable to Voicebroker in the amount of $1,950, to be transmitted via the U.S. mail.

Fraudulent Sales of February TET Propane Based on the Artificial OPIS Index Price

48.    The conspirators named below, in order to profit from the scheme, engaged in the following sales of February 2004 TET propane at artificially inflated prices based on the OPIS index, each of which is a separate overt act:

a.    On or about February 24, 2004, ABBOTT sold to Company E, 30,000 barrels of February 2004 TET propane on behalf of BP at a price based on the OPIS daily average for February 24 through 27; and

b.    On or about February 24, 2004, **CLABORN** sold to Company F, 50,000 barrels of February 2004 TET propane on behalf of BP at a price based on the OPIS daily average for February 25 through 27.

Accepting Delivery of Remaining Propane

49.    On or before February 29, 2004, **SUMMERS, RADLEY, CLABORN, KIENENBERGER,** ABBOTT and others caused BP to accept delivery of approximately 4 million barrels of February 2004 TET propane at the TEPPCO facility.

All in violation of Title 18, United States Code, Section 371.

14

<u>COUNTS 2-13</u>

7 U.S.C. § 13(a)(2); 18 U.S.C. § 2
**Market Corner and Commodity Price Manipulation**

50.     Paragraphs 1 through 17 and 19 through 49 of this Indictment are realleged and incorporated as if fully set forth here.

51.     From on or about February 5, 2004, through on or about March 15, 2004, within the Northern District of Illinois, and elsewhere, defendants

**MARK DAVID RADLEY,
JAMES WARREN SUMMERS,
CODY DEAN CLABORN
and
CARRIE KIENENBERGER,**

and others, did knowingly and intentionally manipulate and attempt to manipulate the price of February 2004 TET propane, and corner and attempt to corner the market of February 2004 TET propane, a commodity in interstate commerce, by engaging in the conduct described in paragraphs 1 through 17 and 19 through 49 above, culminating in the receipt of funds from trades as set forth below:

| Count: | Approx. Date | Counterparty | Volume (bbls) | Price/ gallon | Receipt of Funds |
|--------|--------------|--------------|---------------|---------------|------------------|
| 2 | 2/24/04 | Company G | 25,000 | $0.8825 | approximately $926,625 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 3 | 2/25/04 | Company H | 10,000 | $0.9125 | approximately $383,250 to Acct. No. xxx7202, Bank One, Chicago, IL |

| 4 | 2/27/04 | Company A | 40,000 | $0.94 | approximately $1,579,200 to Acct. No. xxx7202, Bank One, Chicago, IL |
|---|---------|-----------|--------|-------|---------|
| 5 | 2/27/04 | Company B | 10,000 | $0.94 | approximately $394,800 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 6 | 2/27/04 | Company B | 25,000 | $0.92 | approximately $966,000 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 7 | 2/27/04 | Company D | 5,000 | $0.91 | approximately $191,100 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 8 | 2/27/04 | Company D | 5,000 | $0.925 | approximately $194,250 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 9 | 3/1/04 | Company I | 8,000 | $0.94 | approximately $315,840 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 10 | 3/2/04 | Company J | 25,000 | $0.94 | approximately $987,000 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 11 | 3/3/04 | Company J | 5,000 | $0.94 | approximately $197,400 to Acct. No. xxx7202, Bank One, Chicago, IL |
| 12 | 3/9/04 | Company K | 25,000 | $0.94 | approximately $987,000 to Acct. No. xxx7202, Bank One, Chicago, IL |

| 13 | 3/10/04 | Company L | 5,000 | $0.94 | approximately $197,400 to Acct. No. xxx7202, Bank One, Chicago, IL |
|----|---------|-----------|-------|-------|----------------------------------------------------------------------|

All in violation of Title 7, United States Code, Section 13(a)(2), and Title 18, United States Code, Section 2.

## COUNTS 14-20

### 18 U.S.C. §§ 1343 and 2
### Wire Fraud

52.    Paragraphs 1 through 17 and 19 through 49 of this Indictment are realleged and incorporated as if fully set forth here as constituting the scheme and artifice to defraud referred to herein.

53.    From on or about February 5, 2004, through on or about March 15, 2004, within the Northern District of Illinois, and elsewhere, defendants

**MARK DAVID RADLEY,**
**JAMES WARREN SUMMERS,**
**CODY DEAN CLABORN**
**and**
**CARRIE KIENENBERGER,**

and others, did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud purchasers of February 2004 TET propane at a price set by the OPIS index and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and did use interstate wire communications for the purpose of executing the scheme and artifice, all as more fully set forth below.

54.    On or about the dates set forth below, in the Northern District of Illinois, and

17

elsewhere, for the purpose of executing such scheme and artifice and attempting to do so, the

defendants and others did cause to be transmitted by means of wire communications in interstate

commerce writings, signs, signals and sounds, as described below:

| Count: | Approx. Date | Counterparty | Volume (bbls) | Dates for OPIS Daily Price Term | Wire Communication: |
|---|---|---|---|---|---|
| 14 | 2/23/04 | Company M | 25,000 | 2/24/04 to 2/29/04; OPIS Average +.00125 per gallon | Interstate wire transfer on 3/15/04 to BP bank account at Bank One, Chicago, IL, of approximately $887,086.20. |
| 15 | 2/23/04 | Company N | 25,000 | 2/25/04 to 2/29/04; OPIS Average | Interstate wire transfer on 3/8/07 to BP bank account at Bank One, Chicago, IL, of approximately $898,800. |
| 16 | 2/24/04 | Company E | 30,000 | 2/24/04 to 2/27/04; OPIS Average | Interstate wire on or about 3/9/04 to BP bank account at Bank One, Chicago, IL, of approximately $1,208,500. |
| 17 | 2/24/04 | Company F | 50,000 | 2/25/04 to 2/27/04; OPIS Average | Interstate wire transfer on 3/12/04 to BP bank account at Bank One, Chicago, IL, of approximately $1,794,198. |

| 18 | 2/24/04 | Company O | 25,000 | 2/25/04 to 2/27/04; OPIS Average | Interstate wire transfer on 3/11/04 to BP bank account at Bank One, Chicago, IL, of approximately $897,093. |
| 19 | 2/25/04 | Company P | 25,000 | 2/25/04 to 2/27/04; OPIS Average +.0025 per gallon | Interstate wire transfer on 3/9/04 to BP bank account at Bank One, Chicago, IL, of approximately $899,724. |
| 20 | 2/25/04 | Company P | 75,000 | 2/25/04 to 2/27/04; OPIS Average +.00125 per gallon | Interstate wire transfer on 3/9/04 to BP bank account at Bank One, Chicago, IL, of approximately $2,691,297. |

All in violation of Title 18, United States Code, Section 1343 and 2.

A ___TRUE___ BILL

_____
FOREPERSON


_Steve Tyrrell / J.D._
STEVEN A. TYRRELL
Chief, Fraud Section

PAUL E. PELLETIER
Principal Deputy Chief, Fraud Section

JERROB DUFFY
Trial Attorney, Fraud Section

United States Department of Justice
Criminal Division, Fraud Section
10th & Constitution Avenue, NW
Washington, D.C. 20530
(202) 514-0819

20

(Revised 12/99)

No.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

VS.

MARK DAVID RADLEY, JAMES WARREN SUMMERS, CODY DEAN CLABORN, and CARRIE KIENENBERGER

I N D I C T M E N T

Violation(s):    Title 18 United States Code Sections 371, 1341 and 1343, and
Title 7 United States Code Section 13(a)(2)

A true bill,

_Lauralee J. Gorham_
Foreman

Filed in open court this _____ day of _____, A.D. 19___

MICHAEL W. DOBBINS

_____
Clerk

_____
Bail, $ _____

OCT 25 2005